UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| **JONATHAN D. CLARK, SR**., <br><br> Plaintiff, <br><br> vs. <br><br> **JOHN GROSS**, police officer at Minnehaha Police Station, in his individual and official capacity; **ERIC DOPPENBERG**, correction officer at Minnehaha County jail, in his individual and official capacity. <br><br> Defendants. | 4:15-CV-04068-KES <br><br> ORDER ON MOTIONS DOCKET NUMBERS 49 & 59 <br><br> AND <br><br> REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DOCKET NUMBER 50 |

**INTRODUCTION**

Pending before the court is plaintiff Jonathan D. Clark's *pro se* complaint pursuant to 42 U.S.C. § 1983.  Mr. Clark alleges defendant John Gross used excessive force during his arrest and that defendant Eric Doppenberg used excessive force while transporting him back to the jail after a court appearance related to the arrest.  See Docket No. 1.  Mr. Clark was an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota at the time his complaint was filed, but has since been released.  See Docket 1 & undated Docket entry dated August 5, 2016.  The defendants have moved for summary judgment.  See Docket No. 50.  This matter was referred to this magistrate judge pursuant to the October 16, 2014, standing order of the Honorable Karen

E. Schreier and 28 U.S.C. § 636(b)(1).  The following is this court's
recommended disposition of the motion.

## FACTS[1]

At approximately 2:26 a.m. on April 15, 2014, Officer John Gross was on
patrol with Officer Cullen McClure on West Russell Street in Sioux Falls, South
Dakota, when the officers observed a 1999 maroon Yukon Denali pull onto the
road. (Gross Aff. ¶ 4.)  The officers recognized the driver of the vehicle as
Jonathan D. Clark, an individual with whom the Sioux Falls Police Department
had previous contact.  (Id. at ¶ 5.)   After determining Mr. Clark had no driver's
license and an active warrant out for his arrest, Officers Gross and McClure
initiated a traffic stop of Mr. Clark's vehicle near Madison
Street and Kiwanis Avenue in Sioux Falls. (Id. at ¶ 6).

Clark's vehicle had no license plates; instead, it had paper dealership
plates in the windows, which, through previous encounters, the officers knew
were expired (Id. at ¶ 7). After Mr. Clark pulled his vehicle over, Officer Gross
approached Mr. Clark's vehicle and pulled  him out of the car (Clark Dep.

---

[1] The defendants submitted a statement of material facts pursuant to
Fed. R. Civ. P. 56 and Local Rule 56.1.A.  See Docket 52.  The Court provided
Mr. Clark a copy of these rules along with the scheduling order on September
2, 2015.  See Docket 23.  Nevertheless, Mr. Clark did not comply with Fed. R.
Civ. P. 56 and Local Rule 56.1.B by responding to the defendants' statement of
material facts, paragraph by paragraph.  The court therefore adopts the
defendants' statement of material facts.  The defendants deposed Mr. Clark.
Predictably, Mr. Clark's version of events differs in several respects from the
officers' version of events.  As required on summary judgment, however, where
the facts are disputed, the defendants have represented to the court that they
have incorporated the facts as viewed most favorably to Mr. Clark.   See Docket
52, p. 2.

21:25-22:1).  Officer Gross noticed Mr. Clark was holding a plastic bag in his hand, which Mr. Clark said "was nothing." (Id. at 22:1-4).

Officer Gross immediately put Clark in handcuffs.  (Id. at 22:4-6). After Mr. Clark was handcuffed, Officer Gross began asking him questions.  (Id. at 22:6-7).  Mr. Clark's speech was muffled, and Officer Gross asked him to identify what was in his mouth. (Id. at 22:8-9).  Mr. Clark responded that he had a baggie of marijuana in his mouth, and he spit the bag of marijuana out on the car. (Id. at 22:9-13).

Officer Gross grabbed a flashlight and started looking in Mr. Clark's mouth. (Id. at 22:14-15).  Officer Gross believed there was something else in Mr. Clark's mouth.  (Id. at 22:14-24). There is no dispute Officer Gross observed the plastic baggie to be consistent with the types of bags used to hold drugs. (Gross Aff. ¶ 10).  Mr. Clark denied having anything else in his mouth. (Id.) Officer Gross repeatedly told Mr. Clark to spit out the baggie of white narcotics he believed Mr. Clark had in his mouth. (Id. at 22-24).

Officer Gross grabbed Mr. Clark by the neck.  (Id. at 22:23-25).  Mr. Clark could not breathe. (Id. at 23:1-2). While holding Mr. Clark's neck, Officer Gross tried to pry Mr. Clark's mouth open using the flashlight and Mr. Clark felt the flashlight hit his back tooth.  (Id. at 23:3-13). Mr. Clark fell to the ground, landing on his knee because his hands were handcuffed.  (Id. at 23:13-17).

When Mr. Clark regained awareness, Officer Gross grabbed a pen and tried to use the pen to retrieve whatever was in Mr. Clark's mouth.  (Id. at 23:18-24:1).  At the same time, Officer Gross was holding Mr. Clark's neck and

3

telling Mr. Clark to get the item out of his mouth.  (Id. at 24:1-4).  Suddenly, Mr. Clark started spitting out blood.  (Id. at 24:5-6).  Officer Gross told his partner Mr. Clark swallowed whatever had been in his mouth, and Mr. Clark was told he would be taken to the hospital to have his stomach pumped (Id. at 24:6-12).

The officers took Mr. Clark to the hospital due to concerns for his safety, because they believed he had swallowed drugs (Id. at 24:13-14).  Mr. Clark's injuries from this incident consisted of a scrape on his knee, a chipped back tooth, and a bump on his left forehead  (Id. at 25:14-26:2; 28:8-15).

Although Mr. Clark disputes there was anything else in his mouth, there is no dispute Officer Gross believed Mr. Clark had an additional baggie containing a white narcotic in his mouth. (Compare Clark Dep. with Gross Aff. ¶ 13, 16).

After Mr. Clark was discharged from the hospital, he was transported to the Minnehaha County Jail and was processed for the arrest (Id. at 36:16-37:1).   Later in the day on April 15, 2014, Mr. Clark appeared in magistrate court (Clark Dep. 37:19-22).  Corrections officer Erick Doppenberg transported Mr. Clark from the Minnehaha County Jail to magistrate court (Id. 39:12-16).

At approximately 2:53 p.m., Mr. Clark made his appearance before the Judge (Doppenberg Aff. ¶ 5).  The Judge advised Mr. Clark of his charges and addressed his bond (Id. at ¶ 6).  While being advised of the charges against him arising from his arrest on April 15, 2014, Mr. Clark stood up in the courtroom and began talking to the judge, disputing the validity of the charges (Clark Dep.

4

40:12-18).  Corrections officer Doppenberg approached Mr. Clark and removed him from the courtroom, instructing Mr. Clark it was not the time to be disputing the charges (Id. at 40:19-41:8).

Mr. Clark was in handcuffs and shackles and was having difficulty keeping up with corrections officer Doppenberg while corrections officer Doppenberg escorted him back to the jail  (Id. at 41:8-25).  Corrections officer Doppenberg and Mr. Clark took the elevator upstairs, and when they exited the elevator, Mr. Clark told corrections officer Doppenberg  he could not move that fast, at which point corrections officer Doppenberg picked Mr. Clark up by the back of his pants and slammed him on the ground (Id. at 42:1-13).   Mr. Clark subsequently was placed in a restraint chair (Id. at 54:13-55:5).

As a result of this incident, Mr. Clark suffered the following injuries: scratches/scrapes from the handcuffs and shackles, re-scraping of his kneecap, and some of his hair had been pulled out (Id. at 55:6-17). Mr. Clark did not obtain medical treatment as a result of this incident  (Id. at 55:18- 56:10; see also Doppenberg Aff. Ex. A.)

## DISCUSSION

### A.    Preliminary Matters.

In addition to the defendants' motion for summary judgment (Docket 50), also pending are Mr. Clark's motion to deny the defendants' motion to extend and for appointment of counsel (Docket 49) and motion to dismiss affidavits (Docket 59).

### 1. Motion to Deny motion to extend and for appointment of counsel (Docket 49).

The defendants asked the court for an extension of time to file their motion for summary judgment. Docket 45. The court granted the motion, and extended the motion deadline until March 31, 2016. Docket 47. Mr. Clark moved the court to deny the defendants' request to extend the deadline, but this request was not received by the court until after the court had already granted the defendants' motion. See Docket 49. This portion of Docket 49, therefore, will be denied as moot.

In the same pleading, Mr. Clark requested (for the third time) that counsel be appointed to represent him (see Docket Nos. 29 and 35). In support of his third request for appointed counsel, Mr. Clark explains he is unable to afford counsel, that the defendants' lawyer has not been very cooperative, and that he believes a lawyer would be helpful to him in presenting evidence and cross-examining witnesses at trial. Docket 49, p. 1. These are the same reasons Mr. Clark requested counsel in his first two motions, which were denied by this court. See Docket Nos. 30 and 37.

"Indigent civil litigants do not have a constitutional or statutory right to appointed counsel." Edgington v. Missouri Dep't of Corrections, 52 F.3d 777, 780 (8th Cir. 1995) (abrogated on other grounds by Doe v. Cassel, 403 F.3d 986, 988-89 (8th Cir. 2005)). The factors relevant to evaluating a request for appointment of counsel include "whether both the plaintiff and the court will benefit from the appointment of counsel, taking into account the factual and legal complexity of the case, the presence or absence of conflicting testimony,

6

and the plaintiff's ability to investigate the facts and present his claim." <u>Davis v. Scott</u>, 94 F.3d 444, 447 (8th Cir. 1996).

Mr. Clark's request for appointment of counsel is denied for the reasons already explained in the court's first two orders denying Mr. Clark's previous motions for counsel. Additionally, in April and then again in July and August, 2016, Mr. Clark notified the clerk of a change of address which signifies to the court he is no longer in custody. <u>See</u> Docket entries dated April 20, 2016, July 15, 2016, and August 5, 2016. Mr. Clark now has the ability, therefore, to freely confer with an attorney of his own choice about this case. For this reason as well, that portion of Docket 49 which requests the court to appoint counsel for Mr. Clark is denied.

**2. Motion to dismiss affidavits (Docket 59).[2]**

Mr. Clark asks the court to dismiss the affidavits of Jeremiah Larson (Docket 55), Brad Farniok (Docket 56), and Sidney Dunn (Docket 57). Docket 59. The defendants submitted these affidavits in support of their motion for summary judgment. Mr. Clark opines that because each of the affidavits refer to an affixed exhibit which consists of the affiant's unsigned jail "incident report," the information would be inadmissible at trial and should likewise be inadmissible in this summary judgment proceeding. <u>See</u> Docket 59, p. 1.

---

[2] The court notes Mr. Clark's motion to dismiss affidavits was filed over four months ago but the defendants have never filed a response. The defendants' failure to respond will be excused, however, because it appears Mr. Clark did not properly serve copies of his motion upon defendants or their counsel as required by Fed. R. Civ. P. 5 and Judge Schreier's order dated August 10, 2015 (Docket 18). Mr. Clark attached a certificate of service to his motion, but the certificate of service merely states Mr. Clark sent copies of his motion to the court, not to the defendants or their lawyer. <u>See</u> Docket 59, p. 2.

This issue is governed by FED. R. EVID. 803(6), more commonly known as the business records exception to the hearsay rule.  That rule states:

> **Rule 803.   Exceptions to the Rule Against Hearsay—Regardless of Whether the Declarant is Available as a Witness.** The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
> **
> **(6)   Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:
>   (A)   the record was made at or near the time by—or from information transmitted by –someone with knowledge;
>   (B)   the record was kept in the course of regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>   (C)   making the record was a regular practice of that activity;
>   (D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>   (E)   the opponent does not show that the source of information or the method or circumstances of preparation show lack of trustworthiness.

See FED. R. EVID. 803(6).

FED. R. EVID. 803(6) applies to incident reports generated as a result of jail or prison disturbances. See e.g., Herrerra v. Mowry, 2014 WL 4101611 at *2, n. 2 (Aug. 18, 2014, D. Neb.) (overruling prisoner's objection to the court's reliance on prison incident reports in deciding summary judgment motion, relying upon FED. R. EVID. 803(6)); Lourido-Vidal v. Fisher, 2013 WL 3771223 at *8-9 (July 17, 2013, D. Minn.) (overruling petitioner's hearsay objection to use of incident reports in a § 2241 proceeding, relying upon FED. R. EVID. 803(6)).

Mr. Clark asserts the affidavits and their attached incident reports should not be admissible because they are not signed.  See Docket 59, p. 1. But FED. R. EVID. 803(6) does not require that business records be signed in order to be admissible.  Each of the affidavits Mr. Clark contests are properly authenticated as required by FED. R. EVID. 803(6).  See Docket 55 (Larson affidavit), ¶ 13; Docket 56 (Farniok affidavit), ¶ 10; Docket 57 (Dunn affidavit), ¶ 10.  Mr. Clark's motion to dismiss affidavits, Docket 59, is therefore denied.

**B.    Summary Judgment Standard.**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met

9

its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRACTICE & PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.

Though *pro se* litigants like Mr. Clark are entitled to a liberal construction of their pleadings, Fed. R. Civ. P. 56 remains equally applicable to them.  Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987).  The district court is not required to "plumb the record in order to find a genuine issue of material fact."  Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996).  Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed *pro se* in vindicating their constitutional rights, and [the Eight Circuit does] not approve summary dismissal of such *pro se* claims without regard for these special problems."  Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980).  "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved."  Ross v. Franzen, 777 F.2d 1216, 1219 (7th Cir. 1985).

## C.    Official Capacity Claims.

Mr. Clark has sued both Officer Gross (a city employee) and Officer Doppenberg (a county employee) in their individual and official capacities.  The relief he seeks is money damages.

Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 (1978)).  "It is not a suit against the official personally, for the real party in interest is the entity.  Thus, while an award of damages against an official in his personal capacity can be executed only

11

against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." Graham, 473 U.S. at 166. In official capacity suits, the only immunities available to an individually-named defendant are the immunities that the governmental entity possesses—i.e. usually Eleventh Amendment immunity. Hafer v. Melo, 502 U.S. 21, 25 (1991). Eleventh Amendment immunity, however, does not extend to independent political subdivisions created by the state, such as counties and cities. Hadley v. North Arkansas Community Technical College, 76 F.3d 1437, 1438 (8th Cir. 1996).

"Because the real party in interest in an official capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" must have played a part in the violation of federal law.' " Hafer, 502 U.S. at 25 (citing Graham, 473 U.S. at 166). This is because local governmental entities can only be held liable under § 1983 to the extent the constitutional deprivation was made pursuant to official policy or custom of the city, county or other local governmental unit. See Monell, 436 U.S. at 689-90. Put another way, to impose liability against the defendants on the official capacity claims, Mr. Clark must show the governmental entities that employ the defendants were the "moving force" behind the constitutional deprivation he claims they inflicted. Graham, 473 U.S. at 166.

In this case, Mr. Clark did not assert in his complaint that defendants Gross or Doppenberg acted pursuant to a policy or custom of the city or county. Mr. Clark has not identified in any subsequent pleadings in response

12

to the defendants' summary judgment motion a city or county policy or custom which he claims was the "moving force" behind the constitutional deprivations he alleges were inflicted upon him by the two named defendants.  As such, his official capacity claims fail.  Hafer, 502 U.S. at 25; Graham, 473 U.S. at 166. The court respectfully recommends that Mr. Clark's official capacity claims against both defendants be dismissed.

## D.   Individual Capacity Claims

### 1.   *Prima Facie* Case and Qualified Immunity

Personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." Graham, 473 U.S. at 165.  In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Clark must show (1) defendants acted under color of state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from suit, not just a defense to liability at trial.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 536 (1991).

13

To determine whether an official may partake of qualified immunity, two factors must be determined:  (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand."  Pearson v. Callahan, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Whether the constitutional right at issue was 'clearly established' is a question of law for the court to decide."  Bishop v. Glazier, 723 F.3d 957, 961 (8th Cir. 2013) (citation omitted).   "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' "  Stanton v. Sims, 571 U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))).  "'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 134 S. Ct. at 5 (quoting al-Kidd, 131 S. Ct. at 2083).  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' "  Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting

14

Hunter, 502 U.S. at 229).  "When a plaintiff can identify 'cases of controlling authority in the jurisdiction at the time of the incident' or 'a consensus of cases of persuasive authority' affirming the allegedly violated right, the law is clearly established."  Pennington v. Terry, 2016 WL 2016 WL 1127774 at * 7 (6th Cir. Mar. 23, 2016) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).  In other words, to defeat qualified immunity in this case, the plaintiff must show the officers' conduct was contrary to either (1) controlling authority or (2) a "robust consensus of persuasive authority."  Plumhoff v. Rickard,  ___ U.S. ___, 134 S. Ct. 2012, 2023 (2014) (citing al-Kidd, 563 U.S. at 741-42) (other citations omitted).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery."  Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818).  Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery."  Id.  Even then, the Court has pointed out that FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery."  Id.  Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence.  Id.  In this case, the defendants did not move to stay discovery and it appears that at least

some limited discovery has occurred.  See Docket Nos. 43, 48 (referring to plaintiff Clark's interrogatories to the defendants and their answers to the same).

### a.  The Law of Excessive Force

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000) (citing Graham v. Connor, 490 U.S. 386, 394 (1989)).  Mr. Clark's *pro se* complaint does not explicitly identify the constitutional right(s) he believes Officer Gross and Officer Doppenberg infringed by their respective actions, but he asserts each of them used excessive force.  The excessive force alleged by Mr. Clark against Officer Gross occurred during the course of Mr. Clark's arrest. The excessive force alleged by Mr. Clark against Officer Doppenberg occurred after Mr. Clark's initial appearance/arraignment and bond hearing, but before his conviction and sentencing.

> [T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution.  If the victim is an arrestee, the Fourth Amendment's "objective reasonableness" standard controls. Graham v. Connor, 490 U.S. 386, 388 (1989).  The evaluation of excessive force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard.  Johnson-El v. Schomehl, 878 F.2d 1043, 1048-49 (8th Cir. 1989).  . . .  Excessive force claims brought by [convicted] prisoners fall under the protections provided by the Eighth Amendment's prohibition of cruel and unusual punishment.  Whitley v. Albers, 475 U.S. 312, 318-22 (1986).

16

<u>Andrews v. Neer</u>, 253 F.3d 1052, 1060-61 (8th Cir. 2001).  In <u>Wilson</u>, the Eighth Circuit acknowledged that beyond the point at which arrest ends and pretrial detention begins lies somewhat of a "legal twilight zone," during which it is not quite clear which standard applies.  <u>Wilson</u>, 209 F.3d at 715 (citing <u>Graham</u>, 490 U.S. at 395, n.10).

In <u>Andrews</u> the Eighth Circuit conceded it has never "drawn a bright line dividing the end of an arrestee's status and the beginning of the pre-trial detainee's status."  <u>Andrews</u>, 253 F.3d at 1052.   Mr. Clark's claims against Officer Gross arose during his arrest.  His claims against Doppenberg arose *after* his arraignment/bond hearing, so he had crossed the threshold from arrestee to pretrial detainee.  Mr. Clark's claims, therefore, are not in the "legal twilight zone," but fall into those described above as pertaining to arrestees (Fourth Amendment reasonableness) and pretrial detainees (Fourteenth Amendment reasonableness).

**1. Officer Gross**

Officer Gross observed Mr. Clark with a baggie in his hand during the course of Mr. Clark's arrest.   Officer Gross knew such baggies to be indicative of the use of illegal drugs.  Officer Gross also observed Mr. Clark spit a small baggie of marijuana out of his mouth.  Though Mr. Clark denied (and continues to deny) anything else remained in his mouth, Mr. Clark does *not* deny that Officer Gross *believed* Mr. Clark still had another baggie of drugs in his mouth.  Officer Gross, therefore, used a flashlight or flashlight/pen-like instrument to look into Mr. Clark's mouth while holding Mr. Clark's neck in a choking

17

fashion in an attempt to get Mr. Clark to spit out what Officer Gross *believed* was another baggie of drugs.   Mr. Clark alleges that as a result, he momentarily lost awareness, fell and scraped his knee, and chipped one of his teeth which eventually needed to be pulled.   When the incident was concluded, Officer Gross believed Mr. Clark had succeeded in swallowing the baggie of drugs, so he transported Mr. Clark to the hospital to be examined before taking him to the jail.

"An officer's use of force violates the Fourth Amendment when it is objectively unreasonable, given the facts and circumstances of the particular case, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " Bishop v. Glasier, 723 F.3d 957, 961 (8th Cir. 2013) (citing Graham v. Connor, 490 U.S. 386, 396-97 (1989).

In Graham, the Court cautioned against a mechanical application of the definition of reasonableness, but gave examples of factors which might be examined to decide whether an officer's use of force is reasonable in any given instance:  (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.  Graham, 490 U.S. at 396.  This calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Id. at 397.

18

There is no "uniform requirement" that a plaintiff show more than *de minimis* injury to establish excessive force. Chambers v. Pennycook, 641 F.3d 898, 907 (8th Cir. 2011). But the Chambers court also emphasized that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (quoting Graham, 490 U.S. at 396). That the injury resulting from an officer's use of force is insignificant does not automatically render the use of force within the bounds of the Fourth Amendment. Instead, the significance of the injury should be a factor to consider in determining whether the officer's use of force was reasonable under the circumstances. Chambers, 641 F.3d at 908.

Finally, the officer's underlying intent or motivation is not relevant to the "reasonableness" inquiry. Graham, 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. In Burns v. Eaton, 752 F.3d 1136, 1139 (8th Cir. 2014) the court differentiated the proof required for excessive force claims under the Fourth and Eighth Amendments.

> The Fourth Amendment standard is "whether the officers' actions are 'objectively reasonable' in light of the circumstances confronting them, without regard to their underlying intent or motivation," whereas "the subjective motivations of the individual officers are of central importance in deciding whether force was used" maliciously and sadistically to cause harm in violation of the Eighth Amendment.

Burns, 752 F.3d at 1139 (citing Graham, 490 U.S. at 397-98).

The severity of the crime for which Mr. Clark was stopped (expired temporary tags on his vehicle) was relatively minor.  It quickly became apparent to Officer Gross, however, that Mr. Clark possessed multiple baggies which likely contained drugs—at least one in his hand and another in his mouth.  Officer Gross's suspicion was confirmed when Mr. Clark spit a bag of marijuana out of his mouth.  When Officer Gross commanded Mr. Clark to spit out whatever else remained in his mouth but Mr. Clark did not comply, Officer Gross applied force to attempt to retrieve what he believed were more drugs from Mr. Clark's mouth before Mr. Clark swallowed them.

Mr. Clark was handcuffed while Officer Gross attempted to retrieve the item from Mr. Clark's mouth.  There is no evidence Mr. Clark was *per se* attempting to flee or resist arrest, but Officer Gross had to "pry" Mr. Clark's mouth open.  When Mr. Clark refused Officer Gross's command to spit out whatever was in his mouth, or at least cooperate with Officer Gross's attempts to view the inside of his mouth to confirm there were no further drugs, Officer Gross had to make a split-second judgment—in circumstances that were tense, uncertain, and rapidly evolving—about the amount of force that was necessary in the situation.  <u>Graham</u>, 490 U.S. at 397.   While the resulting *de minimis* injuries which resulted do not preclude a finding of excessive force, this court finds Officer Gross's use of force was likewise *de minimis* and was reasonable, and therefore did not violate the Fourth Amendment.

Alternatively, the court examines whether Officer Gross is entitled to qualified immunity.  Mr. Clark cannot prevail unless he shows Officer Gross

violated his Fourth Amendment right to be free from the use of excessive force, *and* that the contours of this Fourth Amendment right were so clearly established that a reasonable official would understand the force applied was excessive.   Chambers, 641 F.3d at 908.  As of April 15, 2014, it was clearly established that an arrestee had the right to be free from the use of excessive force.  Id.  It was not clearly established, however, that an officer's use of a flashlight/pen or a chokehold would violate the Fourth Amendment rights of an uncooperative arrestee suspected of secreting drugs in his mouth.

In Stogner v. Sturdivant, 515 Fed. Appx. 280 (5th Cir. 2013), the plaintiff, widow of an arrestee who died after a traffic stop, sued claiming the officers used excessive force.  Id. at 281.  Officer Sturdivant conducted a traffic stop, during which he noticed Mr. Stogner had a small plastic bag in his hand. Id. at 282.  Officer Sturdivant asked about the small bag and asked Mr. Stogner to release it.  Id.  Mr. Stogner refused, and resisted showing his hands or being handcuffed.  Id.  More officers arrived on the scene.  A struggle ensued, during which Mr. Stogner was finally taken to the ground and handcuffed.  Id.   Mr. Stogner by then was not breathing, and had put the bag in his mouth which the officers tried to remove.  Mr. Stogner was transported to the hospital where he died.  Id. at 292.  The bag contained methamphetamine, and Mr. Stogner's death was attributed to the combination of a pre-existing condition and his ingestion of methamphetamine.  Id.

The court held the officers were entitled to qualified immunity as to their use of force in arresting Mr. Stogner.  Id.  at 282-83.

21

>Stogner repeatedly refused to comply with Sturdivant's requests to "spit the bag out" and to place his hands behind his back. Sturdivant struggled to restrain Stogner, a relatively large man, against the hood of his patrol car and on the ground.  At no point from the beginning of Sturdivant's initial request to release the plastic bag until the end of the struggle did Stogner attempt to comply with Sturdivant; indeed, Sturdivant had to exert considerable force to keep Stogner even minimally still.  We cannot conclude from this evidence that Sturdivant's conduct was objectively unreasonable.

Id. at 283.  In a footnote, the court noted it was not entirely clear from the video of the traffic stop whether a "choke hold" was used on Mr. Stogner.  Id. at 282, n. 1.  But, even assuming such a maneuver was used to prevent Mr. Stogner from swallowing the drugs, the court declined to condemn it as unconstitutional because, especially to prevent one from swallowing drugs, "choke-holds in themselves are not legally impermissible." Id. (citing Wagner v. Bay City, Tex., 227 F.3d 316, 324 (5th Cir. 2000); United States v. Harrison, 432 F.2d 1328, 1330 (D.C. Cir. 1970)).

The officers used a Taser[3] to prevent the suspect from swallowing drugs during a traffic stop in Pennington v. Terry, 2016 WL 1127774 at * 1 (6th Cir. Mar. 23, 2016).  The driver of the car in which Mr. Pennington was riding was stopped for driving with a revoked license.  Id. at *1.  The officer noticed the passenger (Mr. Pennington) was trying to hide something, so the officer asked Mr. Pennington to exit the vehicle.  Id.  As he exited the vehicle, Mr. Pennington transferred something from his hand into his mouth.  Id.  One of the officers

---

[3] The Sixth Circuit did not believe the plaintiff's "strained interpretation of the video tape" which he claimed depicted that the officers deployed the Taser.  Id. at *5.  Nevertheless, the court decided the qualified immunity claim "assuming that a reasonable jury could" accept Mr. Pennington's assertion that the officers did deploy the Taser.  Id. at *6-12.

held Mr. Pennington's arm while the other "grasped" his neck.  Id.  Both officers repeatedly ordered Mr. Pennington to spit out whatever he had put in his mouth.  Id.  The officers placed Mr. Pennington on the ground and handcuffed him, while still holding his neck.  Id. at *2.  They inspected his mouth with a flashlight after Mr. Pennington denied he had swallowed the object.  Id.  When Mr. Pennington continued to refuse to spit out the item but instead insisted there was nothing in his mouth, the officers tased him.  Id.  After the tasing, the officers found one pill in Mr. Pennington's pocket and two pills lying on the ground near Mr. Pennington, which the officers stated Mr. Pennington either dropped or spit out.  Id. at *3.  The pills were identified as Schedule III narcotics.  Id.  Mr. Pennington brought a § 1983 lawsuit against the officers, asserting they used excessive force during his arrest.

In deciding whether the officers were entitled to qualified immunity, the Sixth Circuit framed the issue as follows:  "whether Pennington had a clearly established right as of [the date of his arrest] not to be tased when, on one hand, he did not threaten the officers, was not resisting arrest, and was not attempting to flee, but on the other hand, was attempting to destroy evidence, disobeying police orders to spit out the pills, and potentially putting himself at risk of harm."  Id. at * 9.  The court conceded that using a Taser on a non-resistant, non-threatening person would violate the Fourth Amendment.  Id.  Mr. Pennington's case was different, however, because the government had an interest in preventing a potential drug overdose and preventing the destruction of evidence.  Id.  As of the date of Mr. Pennington's arrest, "it was not clearly

established  . . . that using a Taser in furtherance of these two legitimate governmental interests violated the Fourth Amendment." Id.  The Court also recognized that "law enforcement may constitutionally apply force to neutralize a safety threat to the plaintiff himself." Id. at *10 (citing Cale v. West Bloomfield Township, 485 Fed. Appx. 92, 96 (6th Cir. 2012)) (other citations omitted).

The Pennington court could locate no other Sixth Circuit case which was directly on point (use of a taser on a subdued arrestee to prevent a drug overdose).  It did, however, cite several cases which found "objectively reasonable" police tactics such as pepper spray, tasers, and knee strikes to the neck and face to prevent the destruction of evidence when law enforcement was confronted with a suspect who attempted to either swallow or otherwise dispose of drug evidence during arrest.  Id. at *11 (citing numerous cases).

The court found that in the absence of precedent which addressed, much less condemned the use of force to prevent a drug overdose or to preserve evidence, a reasonable officer would not be on notice that the use of a Taser to accomplish those goals violated the Fourth Amendment.  Id.  The officers, therefore, were entitled to qualified immunity.  Id.

In German v. Sosa, 399 Fed. Appx. 554 (11th Cir. 2010), the plaintiff (Mr. German) brought an excessive force claim after he was arrested and the officers on the scene believed he was attempting to chew or swallow drugs.  Id. at 556. The court noted Mr. German "provided no evidence either that [the officers] did not possess these beliefs, or that these beliefs were objectively unreasonable

24

based on the totality of the circumstances." Id.  Mr. German claimed the officers' use of force was excessive because in their efforts to prevent him from swallowing the drugs, one officer put his hands around Mr. German's neck and slammed him against the car and the other tased him. Id. at 557.   The Eleventh Circuit disagreed:

> It is constitutional for officers recognizing an attempt to swallow and destroy what appears to be narcotics to hold the suspect's throat and attempt to pry open the suspect's mouth by placing pressure against his jaw and nose.  See Espinoza v. United States , 278 F.2d 802, 804 (5th Cir. 1960).  . . . Therefore, [the officer] did not violate a clearly established right in his use of force to attempt to stop German from swallowing the evidence.
>
> Second, we also cannot say that [the second officer] violated a clearly established right when he tased German.  No case, statute or principle within the Constitution provides the necessary precedent to clearly establish the rights German claims were violated by [the second officer's] use of a taser.  Thus, qualified immunity applies in this case unless German can show that the defendants' actions were so egregious and unacceptable as to have blatantly violated the Constitution.  See Lewis, 561 F.3d at 1292. This standard is only met when "every reasonable officer would conclude that the excessive used force was plainly unlawful."  Id. (citing Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926-27 (11th Cir. 2000)).

Id. at 557.  The court found the defendant officers were entitled to qualified immunity because it was not clearly established that the force they used was excessive.  Id.

In United States v. Holloway, 906 F. Supp. 1437 (D. Kan. 1995), the defendant (Mr. Holloway) moved to suppress evidence based upon his assertion that the officers used excessive force during his arrest in violation of the Fourth Amendment.  Id. at 1439, 1440-41.  The officers handcuffed Mr. Holloway but when they questioned him, he could not audibly respond.  Id. at 1439.  The

25

officers believed Mr. Holloway had something in his mouth so they ordered him to spit it out.  Id.  Mr. Holloway refused.  Id.  The officers "physically manhandled" Mr. Holloway in their attempts to extract whatever was in his mouth.  Id.  They sprayed him with CAPSTUN®.[4]  Id.  Mr. Holloway also asserted the officers choked him from behind and "kneed" his back, making it hard for him to breathe.  Id.  Finally, Mr. Holloway disgorged a quantity of cocaine from his mouth.  Id.

Mr. Holloway moved to suppress the cocaine, arguing the officers' conduct amounted to excessive force and therefore violated the Fourth Amendment.  The district court began its analysis by observing, "to belabor the obvious, there is no constitutional right to destroy or secret evidence."  Id. at 1441 (citing United States v. Corral-Corral, 899 F.2d 927, 930 (10th Cir. 1990)).  The court proceeded to examine other cases in which evidence was obtained from a suspect's "mouth or other orifice," many of which involved the officer using some form of force to dislodge an object from the suspect's mouth or throat.  Id. at 1442 (citing numerous cases).  The Holloway court noted incidentally that the officers' removal of the cocaine from Mr. Holloway's mouth "potentially minimized the risk of accidental overdose from ingestion of narcotics."  Id.  at 1443.  The court denied Mr. Holloway's motion to suppress because it found the officers' conduct was reasonable under the circumstances and was therefore not excessive.  Id.  at 1444.

---

[4] CAPSTUN® is a brand of pepper spray that is commonly used by law enforcement.  See http://zarc.com/Products/CAP-STUN-Standard-Duty (last checked September 23, 2016).

26

In order to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. <u>Stanton</u>, 134 S. Ct. at 5 (quoting <u>al-Kidd</u>, 131 S. Ct. at 2083).  This court has conducted a search for similar fact patterns in both this circuit and others and has found neither (1) controlling authority nor (2) a robust consensus of persuasive authority to suggest that Officer Gross's use of force was excessive.  <u>Plumhoff</u>, 134 S. Ct. at 2023 (citing <u>al-Kidd</u>, 563 U.S. at 741-42) (other citations omitted).  Quite to the contrary, the existing authority suggests Officer Gross's use of force was within the bounds of the Fourth Amendment.   Officer Gross is therefore entitled to qualified immunity.  <u>Chambers</u>, 641 F.3d at 908.

### 2. Officer Doppenberg

Officer Doppenberg escorted Mr. Clark out of the courtroom and back to the county jail after Mr. Clark caused a disturbance during his arraignment/bond hearing.   Mr. Clark was in handcuffs and leg shackles. Officer Doppenberg and his fellow officers describe Mr. Clark's behavior as "resisting" while Mr. Clark asserts he simply could not keep up with Officer Doppenberg's  pace during the walk back to the jail.  <u>Compare</u> Doppenberg Affidavit, Docket 54, ¶ 14, 18, 22 and attached EX A; Larson Affidavit, Docket 55, ¶ 7, 8, 11 and attached EX A; Farniok Affidavit, Docket 56, ¶ 4, 5, 6, 8 and attached EX A; Dunn Affidavit, Docket 57, ¶ 4, 5, 6, 8 and attached EX A to Mr. Clark's complaint, Docket 1, p. 6 and deposition, Docket 58 attached EX A. Mr. Clark's deposition testimony regarding the incident is reproduced in part below:

Q:     I want you to tell me, if you will, what your claims against
       CO Doppenberg are.  What do you think he did that violated
       your rights?

A:     Okay.  I was standing up in court talking to the judge and
       the judge, she was telling me my charges.  And I told the
       judge, I was like there wasn't no cocaine found.  There
       wasn't no drugs found.  Do you know what I'm saying?  It
       was rock salt.  Do you know what I'm saying?  That's what I
       literally told her, it was rock salt.

       And all of a sudden, I felt somebody come up behind me and
       grab me, like grab me and pull me up out of there.  And
       what I did hear the person say is about that I am going to
       mess up the case or something, you're going to mess up the
       case, you're going to mess up the case.  It's not the time
       right now or something like that.

Q:     Who said that?

A:     That was Mr. Doppenberg; that's what he told me.  He was
       like I was going to mess up the case.  This is not the time
       right now to be saying that out loud, do you know what I'm
       saying, in court. But I'm saying I'm wondering why I'm
       getting locked up for cocaine when there wasn't no drugs
       found.  So he grabbed me.  I was in handcuffs and shackles,
       and he started pulling me up out the door.  And I was like
       man, you are pulling me too hard.  Do you know what I'm
       saying?  I can't walk that fast.  You're hurting me.  I was like
       man, the shackles are cutting my ankles and they're cutting
       my wrists.

       If you look in the police, in the county photos that I took—
       because she only sent me like four photos, but I took more
       photos than that—you'll see that I had cut wounds on my
       wrists and on my ankles, also, from where the shackles dug
       into my skin and cut me from where he was pulling me to.  I
       told him like you're pulling me, you're pulling me, you're
       hurting me.  Do you know what I'm saying?  I was like I can't
       walk that fast. He was like well come on, come on, keep up,
       keep up.

       He put me on the elevator and we went upstairs.  And when
       we got upstairs I slowed down, I just slowed down like man,
       you're pulling me too fast.  I can't move that fast.  He just
       picked me up by my pants and slammed me on my, he

                                    28

> picked me up by the back of my pants and slammed me
> down on the ground.
> ***
> He picked me up and slammed me on the ground.
>
> ***
>
> Q:     Well, why were you put in a restraint chair, do you know?
>
> A:     Because I guess Officer Doppenberg thought that I was
> tripping.  He thought I was tripping out,[5] because I'm saying
> why am I getting locked up, what am I getting locked up for?
> Do you follow me?  I'm like man, I didn't do anything.  He
> was pulling me through the, he was pulling me through the,
> from the court pulling me all the way down the hall.  We got
> up to the elevator.  I'm like man, there wasn't no drugs
> found, there wasn't no drugs found.  I guess he believed I
> was tripping, like man.  Do you know what I'm saying?  But
> I'm like in shackles and handcuffs.  So I guess he got tired of
> me slowing down on him; because when I was telling him he
> was pulling me too much, he just grabbed me and slammed
> me on the floor and called for backup.

See Docket 58, p. 7-9 (EX A, Clark deposition, pp. 40-42; 54-55).

The injuries Mr. Clark alleges he sustained as a result of this incident are that he suffered scratches/scrapes from the handcuffs and shackles, he re-scraped his kneecap, and some of his hair was pulled out.  Mr. Clark did not receive medical treatment as a result of this incident.  In his deposition, Mr. Clark explained to defense counsel that he requested medical attention after this incident, but an officer merely photographed his injuries. Docket 58, p. 9.[6]

_____

[5] "Tripping out" is slang for "to react with extreme emotion; 'freak out.'" See http://onlineslangdictionary.com/meaning-definition-of/trip-out (last checked September 26, 2016).

[6] In his Fourth Motion to Compel (Docket 43), Mr. Clark provided the court with several documents including correspondence to him from defense counsel.  From that filing, the court concludes Mr. Clark's injuries were

The United States Supreme Court recently clarified the standard to be applied to Fourteenth Amendment excessive force cases in <u>Kingsley v. Hendrickson</u>. 135 S. Ct. 2466 (2015).  In <u>Kingsley</u>, the plaintiff, a pretrial detainee, brought a § 1983 lawsuit against several jailers after they forcibly removed him from his jail cell when he refused to comply with their instructions.  <u>Id.</u> at 2468.

Mr. Kingsley was awaiting trial in a county jail in Wisconsin.  <u>Id.</u> at 2470. He refused to remove a piece of paper from the light fixture in his cell, so his jailers decided to move Mr. Kingsley to a different cell.  Mr. Kingsley did not cooperate with the move.  <u>Id.</u>  In their attempt to forcibly move him, Mr. Kingsley claimed the jail officers handcuffed him, kneed him in the back, slammed his head onto a concrete slab, and tased him.  <u>Id.</u>  The court instructed the jury that for Mr. Kingsley to prevail, they must find the officers "knew that using force presented a risk of harm to plaintiff, but they recklessly disregarded plaintiff's safety by failing to take reasonable measures to minimize the risk of harm to plaintiff."  <u>Id.</u> at 2471.  The Supreme Court reversed because it decided the instruction erroneously injected a subjective element into the standard, which should be solely objective.  <u>Id.</u> at 2472, 2477.

The Court began its analysis by explaining that when deciding a pretrial detainee's excessive force claim under the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  <u>Id.</u> at 2473.  The Court explained:

photographically documented.  Neither party, however, has provided the court with any photographic evidence.

A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.  See Graham v. Connor, 490 U.S. 386, 396 (1989).   A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 540 (1979).

Id.

The Court suggested consideration of the following factors to determine the reasonableness or unreasonableness of the force used:  (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting.  Id.

The Court acknowledged its previous statements explaining that the Due Process clause "protects a pretrial detainee from the use of excessive force that amounts to punishment" or that such "punishment" could consist of actions taken with "*expressed intent* to punish" Id. (emphasis added)  (quoting Graham, 490 U.S. at 395, n.10; Bell, 441 U.S. at 538).   The Court explained, however, that despite its earlier references to "punishment" a pretrial detainee need not prove the officer's *subjective intent* to prevail:

[T]he Bell, court went on to explain that, in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that actions are not "rationally related to a legitimate nonpunitive governmental purpose" or that the actions "appear excessive in relation to that purpose." Bell, 441 U.S. at

31

561.  The <u>Bell</u> Court applied this latter objective standard to evaluate a variety of prison conditions, including a prison's practice of double-bunking.  In doing so, it did not consider the prison official's subjective beliefs about the policy.  <u>Id.</u> at 541-43.  Rather, the Court examined objective evidence, such as the size of the rooms and available amenities, before concluding that the conditions were reasonably related to the legitimate purpose of holding detainees for trial and did not appear excessive in relation to that purpose.

<u>Bell's</u>  focus on "punishment" does not mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his due process rights were violated.  Rather, as <u>Bell</u> itself shows (and as our later precedent affirms) a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.

<u>Id.</u> at 2473-74.  The Court reiterated that courts must make the reasonableness determination "from the perspective and with the knowledge of the defendant officer."  <u>Id.</u> at 2474.  Finally, it stressed that courts "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate."  <u>Id.</u>

Before <u>Kingsley</u>, the Eighth Circuit described the excessive force standard, grounded in the Fourteenth Amendment Due Process clause, as relying on an objective reasonableness standard.  <u>See, e.g.</u>, <u>Andrews v. Neer</u>, 253 F.3d 1052, 1060 (8th Cir. 2001) (citing <u>Johnson-El v. Schoemehl</u>, 878 F.2d 1043, 1048 (8th Cir. 1989)).  <u>See also</u> <u>Smith v. Conway County, Arkansas</u>, 759 F.3d 853  (8th Cir. 2014).  The <u>Smith</u> court explained the Fourteenth Amendment excessive force standard in a fashion which loosely resembles the

32

manner in which the United States Supreme Court would later explain it in

Kingsley:

> Because Smith was a pretrial detainee, the county "concededly
> [could] detain him to ensure his presence at trial and [could]
> subject him to the restrictions and conditions the of detention
> facility so long as those conditions and restrictions do not amount
> to punishment, or otherwise violate the Constitution." Bell v.
> Wolfish, 441 U.S. 520, 536-37 (1979). "Although 'the Eighth
> Amendment has no application' until there has been a 'formal
> adjudication of guilt,' the Fourteenth Amendment gives state
> pretrial detainees—just as the Fifth Amendment gives federal
> pretrial detainees—rights which are 'at least as great as the Eighth
> Amendment protections available to a convicted prisoner.' " Walton
> v. Dawson, 752 F.3d 1109, 1116-17 (8th Cir. 2014) (emphasis
> omitted) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239,
> 244 (1983)). "Conduct constituting 'cruel and unusual
> punishment' *a fortiori* constitutes punishment. And the Due
> Process Clause prohibits *any* punishment of a pretrial detainee, be
> that punishment cruel and unusual or not." Edwards, 750 F.3d
> at 732, n. 2.

Smith, 759 F.3d at 858. The court discussed the Eighth Amendment analysis,

wherein the inquiry focused on whether the force applied was in a good-faith

effort to restore discipline, or "maliciously and sadistically to cause harm." Id.

(citing Santiago v. Blair, 707 F.3d 984, 990 (8th Cir. 2013) (quoting Hudson v.

McMillan, 503 U.S. 1, 7 (1992)). The court then analyzed the use of a taser in

the context of the Eighth Amendment. Id. at 859-60. The Eighth Amendment

analysis also begins with whether the force used was *reasonable*, "judged from

the perspective of a reasonable officer on the scene and in light of the

particular circumstances." Id. at 858 (citations omitted). The court also cited

several other factors to consider in deciding whether the force used was

reasonable (and therefore exercised in a good faith effort to restore discipline,

rather than sadistically or maliciously to cause harm). They were the same

factors later cited by the Supreme Court in Kingsley to determine reasonableness under the Due Process Clause:  (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials and; (4) any efforts to temper the severity of the response.  Id. at 858 (citations omitted).

The court acknowledged that when deciding whether the use of the taser upon Mr. Smith, a pretrial detainee, constituted excessive force,

> The test is an objective one:  the perspective of a reasonable officer under the particular circumstances.  Assuming a reasonable officer in Zulpo's position—actually being kicked—would believe the kick was purposeful and aggressive, establishing Zulpo's first use of the taser was reasonable, we cannot say the same for the second taser deployment.

Because the court found it was clearly established that "the law does not authorize the day-to-day policing of prisons  . . .  either by stun gun or by taser,"  it denied qualified immunity to the Officer Zulpo as to his second taser strike to Mr. Smith.  Id. at 861 (citations omitted, punctuation altered).

The Eighth Circuit also, however, periodically described the Fourteenth Amendment excessive force standard as protecting the pretrial detainee from force that amounts to "punishment" while suggesting a showing of subjective intent was a necessary element of the claim.  Edwards, 750 F.3d at 732. "Thus, our due-process excessive-force analysis focuses on whether a defendant's *purpose* in using force against a pretrial detainee was to injure, punish, or discipline the detainee."  Id.  (citations omitted, punctuation altered, emphasis added).   After Kingsley, requiring a showing of subjective intent to

punish in order to recover on a Fourteenth Amendment excessive force claim is clearly incorrect.

To prevail on his excessive force claim against Officer Doppenberg, Mr. Clark must show that Officer Doppenberg's use of force violated Mr. Clark's Fourteenth Amendment Due Process rights, and that existing precedent placed the statutory or constitutional question beyond debate (i.e. that Officer Doppenberg is not entitled to qualified immunity). Stanton, 134 S. Ct. at 5 (quoting al-Kidd, 131 S. Ct. at 2083).

Mr. Clark asserts Officer Doppenberg "slammed" him to the ground immediately before he (Doppenberg) called for back up and then placed him in a restraint chair. In his complaint Mr. Clark disputes he was at the time of the incident resisting Officer Doppenberg's attempt to transport Mr. Clark back to the jail. But in Mr. Clark's deposition testimony he offered insight into the circumstances, as reasonably viewed by Officer Doppenberg.

When asked why Officer Doppenberg placed him the restraint chair, Mr. Clark explained: "[Officer Doppenberg] thought I was tripping out." The relevant question in a Fourteenth Amendment excessive force inquiry is whether the force used was objectively reasonable but the court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. Graham 490 U.S. at 396 (1989). This court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies

35

and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and maintain institutional security." <u>Bell v. Wolfish</u>, 441 U.S. 520, 540 (1979).

Mr. Clark's admission that Officer Doppenberg thought he (Clark) was "tripping out" combined with the affidavits from three other officers who were on the scene describing Mr. Clark's behavior, indicates to this court that Officer Doppenberg's  reaction to Mr. Clark's behavior, as described in Mr. Clark's complaint and deposition were "reasonably related to the institution's interest in maintaining jail security . . .  even if they  [were] discomforting." <u>Bell v. Wolfish</u>, 441 U.S. 520, 540 (1979).

The court finds the amount of force used was reasonable.  To make this determination, the court has considered the factors urged in <u>Kingsley</u> 135 S. Ct. at 2473.  (1) Mr. Clark, though he does not concede he was resisting Officer Doppenberg's efforts to escort him back to the jail, does concede Officer Doppenberg perceived he was "tripping out" because he had been assessed a high bond and had been held over on drug charges when he (Clark) insisted no drugs had been found.  The force Officer Doppenberg used consisted of taking Mr. Clark to the ground ("slammed," in Mr. Clark's words) and placing him in a restraint chair in order to effectively transport Mr. Clark back to his jail cell; (2) the extent of Mr. Clark's injuries (scraped knee, cuts/scratches from shackles and a patch of missing hair) are *de minimis*; (3) Officer Doppenberg attempted to temper or limit the amount of force by placing Mr. Clark in the restraint chair, thereby de-escalating the situation; (4) the severity of the

36

security problem at issue was legitimate, because Mr. Clark was being transported through the hallway of the courthouse and into the jail, in the presence of other inmates; (5) the threat was reasonably perceived by the officer because in addition to the affidavits from the other officers describing Mr. Clark's behavior, Mr. Clark himself admitted in his deposition that Officer Doppenberg believed he (Clark) was "tripping out"; and (6) though plaintiff claims he was not resisting, he admits his behavior led Officer Doppenberg to believe he was "tripping out" because of his continued protests about his bond hearing in front of the judge.   Kingsley, 135 S. Ct. at 2473.

Alternatively, the court examines whether Officer Doppenberg is entitled to qualified immunity.  Mr. Clark cannot prevail unless he shows Officer Doppenberg violated his Fourteenth Amendment right to be free from the use of excessive force, *and* that the contours of this Fourteenth Amendment right were so clearly established that a reasonable official would understand the force applied was excessive.   Chambers, 641  F.3d at 908.  As of April 15, 2014, it was clearly established that a pretrial detainee had the right to be free from the use of excessive force.  Andrews, 253 F.3d at 1061.   It was not clearly established, however, that an officer's act of taking a pretrial detainee to the ground for the purpose of placing him in a restraint chair would constitute excessive force in violation of the Fourteenth Amendment .

This court's review reveals a dearth of authority regarding the appropriate amount of force when confronted with a pretrial detainee who is described as "tripping out."  What little case-law has been found regarding the

37

appropriate use of a restraint chair, however, indicates it is not clearly established that the use of a restraint chair constitutes excessive force, especially when the chair is used to restore order, keep the peace, establish control, or maintain security.  See e.g. Gentry v. English, 2016 WL 4492832 at * 4 (July 5, 2016, N.D. Alabama) (officers' use of restraint chair not excessive force even though pretrial detainee was not actively resisting because their "perception of a serious security problem was not unreasonable."); Birdine v. Gray, 375 F. Supp. 2d  874, 880-81 (D. Neb. 2005) (use of restraint chair to gain control of pretrial detainee not excessive force); Davis v. Lancaster County, Neb., 2007 WL 2728549 at * 6 (Sept. 17, 2007, D. Neb.) (officer's placement of pretrial detainee in restraint chair not excessive force because he was required to restore order and maintain security in the jail; placing detainee in the chair was not excessive in relation to that interest); Dalluge v. Coates, 2008 WL 678647 at * 4 (Mar. 7, 2008, E.D. Wash., aff'd 341 Fed. Appx. 310)(use of restraint chair on pretrial detainee not excessive force because plaintiff made no showing chair was used as a means of punishment rather than control).

In order to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. Stanton, 134 S. Ct. at 5 (quoting al-Kidd, 131 S. Ct. at 2083).  This court has conducted a search for similar fact patterns in both this circuit and others and has found neither (1) controlling authority nor (2) a robust consensus of persuasive authority to suggest that Officer Doppenberg's use of force was excessive.  Plumhoff, 134 S. Ct. at 2023 (citing al-Kidd, 563 U.S. at 741-42) (other citations omitted).  What

little authority exists suggests Officer Doppenberg's use of force was reasonable under the circumstances, and therefore within the bounds of the Fourteenth Amendment.   Officer Doppenberg is therefore entitled to qualified immunity. <u>Chambers</u>, 641 F.3d at 908.

## CONCLUSION, ORDER, and RECOMMENDATION

Based upon the foregoing law, facts, and analysis, this magistrate judge Orders:

1. Mr. Clark's motion for appointment of counsel (Docket 49) is DENIED;

2. Mr. Clark's motion to deny motion to extend (Docket 49) is DENIED;

3. Mr. Clark's motion to dismiss affidavits (Docket 59) is DENIED;

Based upon the foregoing law, facts, and analysis, this magistrate judge respectfully recommends:

1. The defendants' motion for summary judgment (Docket 50) be

   GRANTED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 3rd day of October, 2016.

BY THE COURT:

_VERONICA L. DUFFY_
United States Magistrate Judge

39